1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MARK ANTHONY BROWN,                    No.  2: 20-cv-1746 TLN KJN P

12                Petitioner,

13        v.                                ORDER & FINDINGS &
                                            RECOMMENDATIONS
14   DAVID BAUGHMAN,

15                Respondent.

16

17        I.      Introduction

18             Petitioner is a state prisoner, proceeding without counsel, with a petition for writ of habeas

19   corpus pursuant to 28 U.S.C. § 2254.  For the reasons stated herein, petitioner's motion for an

20   extension of time to file an opposition to respondent's motion to dismiss (ECF No. 53) is

21   disregarded and petitioner's motion to file an amended petition (11) is granted.  For the reasons

22   stated herein, the undersigned herein recommends that petitioner's motion to stay (ECF No. 13)

23   be denied and respondent's motion to dismiss this action as barred by the statute of limitations

24   (ECF No. 16) be granted except for petitioner's claim based on Senate Bill 620.[1]  The

25   undersigned recommends that petitioner's claim based on Senate Bill 620 be dismissed for failing

26   to state a cognizable claim for relief.

27   _____

28   [1]  Petitioner's motion to amend and motion to stay and respondent's motion to dismiss were
     previously vacated.  (ECF No. 50.)  These motions are now reinstated.

                                              1

II.     Petitioner's Motion for Extension of Time

On March 11, 2022, petitioner filed the pending motion for a sixty-days extension of time to file an opposition to respondent's motion to dismiss.  (ECF No. 53.)  The background to this motion follows herein.

Respondent filed the pending motion to dismiss on November 6, 2020.  (ECF No. 16.) Due to the COVID-19 pandemic and other circumstances, the undersigned granted petitioner numerous extensions of time to file an opposition.  (See ECF Nos. 22, 24, 26, 38, 49.)

On January 25, 2022, the undersigned granted petitioner forty-five days to file his opposition.  (ECF No. 52.)  The undersigned warned petitioner that no further requests for extension of time would be granted.  (Id.)  Despite this warning, petitioner filed the pending request for extension of time to file his opposition.  (ECF No. 53.)

Petitioner was granted over one year to file his opposition to respondent's motion to dismiss.  While the undersigned acknowledges that the COVID-19 pandemic and other circumstances impacted petitioner's ability to prepare his opposition, petitioner had adequate time and opportunity to prepare his opposition.  Accordingly, the pending motion for extension of time is disregarded pursuant to the January 25, 2022 order directing that no further extensions of time would be granted.

III.    Background

Pursuant to the mailbox rule, petitioner filed the original petition on August 24, 2020. (ECF No. 1 at 34.)  Petitioner challenges his 2013 conviction for two counts of robbery with firearm use enhancements and unlawful possession of a firearm.  (Id. at 2.)  Petitioner is serving a sentence of 18 years.  (Id.)  The petition original raises the following claims:  1) ineffective assistance of counsel; 2) incapacity to enter plea based on mental health problems; and 3) intervening changes in the law affected petitioner's criminal liability.

Pursuant to the mailbox rule, on September 16, 2020, petitioner filed an amended petition (docketed as a second amended petition) and a motion for leave to file an amended petition. (ECF Nos. 11, 12.)  The amended petition raises the same claims raised in the original petition.

////

2

Pursuant to the mailbox rule, on October 12, 2020, petitioner filed a motion to stay this action in order to exhaust additional claims.  (ECF No. 13.)  In this motion, petitioner alleges that his petition (apparently referencing his amended petition) pleads fully exhausted claims.  (Id. at 3.)  Petitioner requests that this action be stayed so that he may return to state court and exhaust two new claims.  (Id. at 1-2.)  Petitioner requests a stay pursuant to the procedures described in Kelly v. Small, 315 F.3d 1063 (9th Cir. 2003).  (Id. at 1-4.)

IV.     Motion to Amend

Rule 15 of the Federal Rules of Civil Procedure applies to requests to amend habeas corpus petitions.  Mayle v. Felix, 545 U.S. 644, 655 (2005); see also 28 U.S.C. § 2242 (habeas corpus petition "may be amended or supplemented as provided in the rules of procedure applicable to civil actions."); In re Morris, 363 F.3d 891, 893 (9th Cir. 2004) ("'Rule 15(a) applies to habeas corpus actions with the same force that it applies to garden-variety civil cases.'" (citations omitted)).

Pursuant to Rule 15(a)(1), a pleading may be amended once as a matter of course within twenty-one days of service, or, if the pleading is one to which a responsive pleading is required, twenty-one days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.  If, as here, the provisions of Rule 15(a)(1) are inapplicable, then a pleading may be amended pursuant to Rule 15(a)(2) only with the opposing party's written consent or leave of court.

The undersigned finds good cause to grant petitioner's motion to amend as the claims raised in the amended petition are the same claims raised in the original petition.  Accordingly, petitioner's motion to amend is granted.

V.     Motion to Dismiss

A.  Calculating Statute of Limitations Period

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a statute of limitations on petitions for writs of habeas corpus filed by state prisoners.  Petitions filed by prisoners challenging noncapital state convictions or sentences must be filed within one year of the latest of the date on which:  (A) the judgment became final after the conclusion of direct review or the time passed for seeking direct review; (B) an impediment to filing an application

created by unconstitutional state action was removed, if such action prevented petitioner from filing; (C) the constitutional right asserted was recognized by the Supreme Court, if the right was newly recognized by the Supreme Court and made retroactive to cases on collateral review; or (D) the factual predicate of the claim could have been discovered through the exercise of due diligence.  28 U.S.C. § 2244(d)(1).

Respondent calculates the statute of limitations pursuant to 28 U.S.C. § 2241(d)(1)(A), i.e., when petitioner's conviction became final.  The undersigned agrees that the statute of limitations is calculated pursuant to § 2241(d)(1)(A) with respect to claims one and two, as these claims concern events allegedly occurring on or around the time of petitioner's conviction.  However, claim three is based on changes in the law.  The statute of limitations for claim three requires a separate discussion.

B.  Statute of Limitations for Claims One and Two

The one-year period generally will run from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).

On February 25, 2013, petitioner pled no contest to two counts of second degree robbery and felon in possession of a firearm.  (ECF No. 17-1 at 1.)  Petitioner also admitted two firearm enhancements, pursuant to California Penal Code § 12022.53(b), for use of a firearm as to each of the robbery counts.  (Id.)  On March 22, 2013, petitioner was sentenced to 18 years in prison.  (ECF No. 17-2.)  Because petitioner did not file an appeal, his conviction became final sixty days later, that is, on Tuesday, May 21, 2013.  See Cal. R. Ct. 8.308(a) (notice of appeal must be filed within 60 days of rendition of a judgment); Cal. Penal Code § 1237(a) (a "sentence" constitutes a "final judgment" for purposes of a defendant's right to appeal); see Thompson v. Sherman, 2019 WL 2807871, at *2 (C.D. Cal. May 21, 2019), report and recommendation adopted, 2019 WL 2764403 (C.D. Cal. July 2, 2019) (for purposes of AEDPA's statute of limitation, California conviction becomes final sixty days after sentencing).  The statute of limitations commenced the following day, i.e., May 22, 2013.  Patterson v. Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001).

////

4

Petitioner had one year from May 22, 2013, to file a timely federal habeas petition, i.e., until May 21, 2014.  Claims one and two are not timely unless petitioner is entitled to statutory or equitable tolling.

1.  Statutory Tolling

The limitation period does not run while a properly filed state application for post-conviction relief is pending.  See 28 U.S.C. § 2244(d)(2); Carey v. Saffold, 536 U.S. 214, 218-219 (2002).

Respondent contends that petitioner filed six post-conviction collateral challenges.  (ECF No. 16 at 2.)

Pursuant to the mailbox rule, on March 19, 2017, petitioner filed his first post-conviction collateral challenge by filing a habeas corpus petition in the Sacramento County Superior Court. (ECF No. 17-3.)  This petition raised one claim:  the sentencing court imposed an illegal restitution fine.  (Id.)  On May 10, 2017, the Superior Court denied this petition.  (ECF No. 17-4.)

Pursuant to the mailbox rule, on August 30, 2018, petitioner filed a second habeas corpus petition in the Sacramento County Superior Court.  (ECF No. 17-5.)  This petition raised the three claims raised in the instant action.  (Id.)  On November 19, 2018, the Superior Court denied this petition.  (ECF No. 17-6.)

Pursuant to the mailbox rule, on January 10, 2019, petitioner filed a habeas corpus petition in the California Court of Appeal.  (ECF No. 17-7.)  This petition raised the three claims raised in the instant action.  (Id.)  On March 28, 2019, the California Court of Appeal denied this petition. (ECF No. 17-8.)

Pursuant to the mailbox rule, on April 8, 2019, petitioner filed a habeas corpus petition in the California Supreme Court.  (ECF No. 17-9.)  This petition raised the three claims raised in the instant action.  (Id.)  On August 28, 2019, the California Supreme Court denied this petition. (ECF No. 17-10.)

Pursuant to the mailbox rule, on April 17, 2019, petitioner filed a third habeas corpus petition in the Sacramento County Superior Court.  (ECF No. 17-11.)  In this petition, petitioner argued that his sentence should be vacated and remanded to the trial court for further proceedings

5

1   due to a change of law affecting petitioner's criminal liability.  (Id.)  In particular, petitioner

2   argued that he was entitled to resentencing because robbery is no longer a violent crime under

3   California law.  (Id.)  Petitioner did not raise this claim in the instant action.  On May 31, 2019,

4   the Superior Court denied this petition.  (ECF No. 17-12.)

5          Pursuant to the mailbox rule, on August 2, 2019, petitioner filed a habeas corpus petition

6   in the California Court of Appeal.  (ECF No. 17-13.)  In this petition, petitioner argued that his

7   sentence should be vacated and remanded to the trial court for further proceedings due to a

8   change of law affecting petitioner's criminal liability.  (Id.)  In particular, petitioner argued that

9   he was entitled to resentencing because robbery is no longer a violent crime under California law.

10  (Id.)  On August 16, 2019, the California Court of Appeal denied this petition.  (ECF No. 17-4.)

11         A state habeas petition filed after the limitations period ended cannot toll it.  "[S]ection

12  2244(d) does not permit the reinitiation of the limitations period that has ended before the state

13  petition was filed," even if the state petition was timely filed.  See Ferguson v. Palmateer, 321

14  F.3d 820, 823 (9th Cir. 2003); Jiminez v. Rice, 276 F.3d 478, 482 (9th Cir. 2001) (same).  In

15  other words, Section 2244(d)(2) cannot "revive" the limitations period once it has run (i.e., restart

16  the clock to zero); it can only serve to pause a clock that has not yet fully run.

17         Herein, petitioner is not entitled to statutory tolling for claims one and two because he

18  filed the first state habeas petition after the statute of limitations expired.  The instant action is not

19  timely unless petitioner is entitled to equitable tolling.

20         1.  Equitable Tolling

21         The Supreme Court has determined that the statute of limitations is subject to equitable

22  tolling in appropriate cases.  Holland v. Florida, 560 U.S. 631, 645 (2010).  Generally, a litigant

23  seeking equitable tolling bears the burden of proving his entitlement to that remedy.  Pace v.

24  DiGuglielmo, 544 U.S. 408, 418 (2005).  "[A] 'petitioner' is 'entitled to equitable tolling' only if

25  he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary

26  circumstance stood in his way' and prevented timely filing."  Holland, 560 U.S. at 649 (quoting

27  Pace, 544 U.S. at 418).

28  ////

To satisfy the first prong under <u>Holland</u>, a litigant must show "that he has been reasonably diligent in pursuing his rights not only while an impediment to filing caused by an extraordinary circumstance existed, but before and after as well, up to the time of filing his claim in federal court." <u>Smith v. Davis</u>, 953 F.3d 582, 598-99, 601 (9th Cir. 2020) (en banc) (rejecting prior stop-clock approach for evaluating when petitioner must be diligent). With respect to the second <u>Holland</u> prong, equitable tolling may be the proper remedy "only when an extraordinary circumstance prevented a petitioner from acting with reasonable diligence from making a timely filing." <u>Id.</u> at 600.  The prisoner also must show that "the extraordinary circumstances were the cause of his untimeliness and that the extraordinary circumstances ma[de] it impossible to file a petition on time." <u>Ramirez v. Yates</u>, 571 F.3d 993, 997 (9th Cir. 2009) (alteration in original) (internal quotation marks and citation omitted).

Arguably, petitioner failed to meet his burden of demonstrating that he is entitled to equitable tolling by failing to oppose respondent's motion to dismiss.  However, in his state petitions, petitioner raised four arguments regarding why his petition should be considered timely: his belief that counsel would file an appeal, mental health issues, he did not receive the case record until 2017, and he was denied law library access.  (ECF No. 17-6 at 2.)  The undersigned herein considers whether petitioner is entitled to equitable tolling as to claims one and two based on his arguments made in state court regarding the timeliness of his petition.

*Equitable Tolling Based on Counsel's Failure to File an Appeal*

The undersigned first considers whether petitioner is entitled to equitable tolling based on counsel's failure to file an appeal.  Equitable tolling may be warranted in instances of unprofessional attorney behavior; however, the AEDPA deadline will not be tolled for a garden variety claim of excusable attorney neglect or mistake." <u>Doe v. Busby</u>, 661 F.3d 1001, 1011-12 (9th Cir. 2011) (citing <u>Spitsyn v. Moore</u>, 345 F.3d 796, 800-02 (9th Cir. 2003)).  The attorney's misconduct must be "a sufficiently egregious misdeed like malfeasance or failing to fulfill a basic duty of client representation" to warrant equitable tolling.  <u>Id.</u> at 1012 (emphasis in original).  For example, trial counsel's failure to file a direct appeal is not an extraordinary circumstance warranting equitable tolling when counsel's alleged negligence has no causal connection to the

1    petitioner's ability to file timely a federal habeas petition.  See Randle v. Crawford, 604 F.3d

2    1047, 1058 (9th Cir. 2010).

3            Petitioner appears to claim that he delayed filing his state habeas petitions because he

4    believed counsel would file an appeal.  However, petitioner does not allege when he discovered

5    counsel's failure to file an appeal.  In the first habeas petition filed in the Sacramento County

6    Superior Court on March 19, 2017, petitioner checked the box reflecting that he did not appeal

7    from his conviction.  (ECF No. 17-3 at 5.)  Therefore, petitioner knew in March 2017 that no

8    appeal was filed in his case.  Petitioner did not file his state habeas petition raising the instant

9    claims until over one year later on August 30, 2018.  (ECF No. 17-5.)  Therefore, petitioner has

10   not shown that counsel's failure to file an appeal, standing alone, prevented him from filing a

11   timely federal habeas corpus petition.  Accordingly, petitioner is not entitled to equitable tolling

12   on these grounds.

13           *Equitable Tolling Based on Delay in Petitioner's Receipt of Legal File and Denial of*

14   *Request for Sentencing Transcript*

15           Petitioner alleged that he is entitled to equitable tolling because he did not receive his

16   "criminal case discovery" from the Sacramento Public Defender's Office until September 2017.

17   (ECF No. 17-5 at 11.)  In support of this claim, petitioner cites mail logs.  (Id.)  Petitioner also

18   alleged that he was denied the sentencing transcript from the Sacramento County Superior Court.

19   (Id.)  Petitioner cited exhibit H attached to the state petition, reflecting that the state court denied

20   his request for the sentencing transcript on July 18, 2018.  (Id. at 232.)

21           For the reasons stated herein, the undersigned finds that petitioner did not act diligently in

22   obtaining counsel's files.

23           In the amended petition, petitioner alleges that he "has been trying to reach [his counsel]

24   since the start of his prison term April of 2013."  (ECF No. 12 at 10.)  Petitioner alleges that San

25   Quentin and California Men's Colony both informed petitioner that they no longer have

26   petitioner's outgoing legal mail from 2013-2014.  (Id.)  Petitioner alleges that he attempted to

27   contact counsel in 2016, but counsel failed to respond.  (Id.)  In his declaration attached to the

28   petition, petitioner states that he attempted to contact his counsel numerous times through letters

                                                          8

and the phone regarding his appeal concerns but received no response.  (Id. at 248.)

In support of these allegations, petitioner also cites records of his outgoing and incoming mail, attached as Exhibit F.  (Id. at 220.)  These records include records of petitioner's outgoing mail from September 26, 2014, to June 7, 2017.  (Id. at 231-32.)  During this time period, petitioner sent one letter to defense counsel dated November 30, 2016.  (Id. at 232.)  These records also reflect that during this time period, petitioner sent no mail to the Sacramento County Public Defender's Office, where counsel was or had been employed.

Petitioner also attaches incoming mail records from October 14, 2014, to June 13, 2017.  (Id. at 228-30.)  These records do not reflect incoming mail from defense counsel or the Sacramento County Public Defender's Office, where counsel was or had been employed.  (Id.)

Petitioner also attaches outgoing legal mail records from July 3, 2017, to October 16, 2017.  (Id. at 225-26.)  These records reflect that petitioner sent mail to the Sacramento Public Defender's Office on August 11, 2017.  (Id. at 226.)  Petitioner attaches incoming legal mail records from June 19, 2017, to October 26, 2017.  (Id. at 223-24.)  These records reflect incoming legal mail to petitioner on September 6, 2017, from the Sacramento County Public Defender's Office.  (Id. at 223.)  Presumably, petitioner received his legal file from the Sacramento Public Defender in the mail received September 6, 2017.

For the following reasons, the undersigned finds that petitioner did act diligently in obtaining his legal files.  While the undersigned does not fault petitioner for failing to produce his mail records from March 2013 to September 12, 2014, petitioner's claim that he attempted to contact counsel "numerous times" during this time period is conclusory.  Petitioner does not describe in any detail his attempts to contact counsel during this time.  Petitioner does not, for example, state the number of letters he sent counsel.  Accordingly, the undersigned does not find that petitioner demonstrated that he acted diligently in his attempts to obtain his legal files from March 2013 to September 12, 2014.  See Miller v. Marr, 141 F.3d 976, 978 (10th Cir. 1998) (denying equitable tolling where petitioner "provided no specificity regarding the alleged lack of access and the steps he took to diligently pursue his federal claims"); Evans v. Adams, 423 F. Supp. 2d 1087, 1091 (C.D. Cal. 2006) (denying equitable tolling where petitioner "provided

absolutely no evidentiary support for his equitable tolling claim, and [did] not even bother[ ] to assert sufficient facts to suggest equitable tolling might be warranted"); Williams v. Dexter, 649 F. Supp. 2d 1055, 1062 (C.D. Cal. 2009) ("grossly conclusory" claims "unsupported by competent evidence" do not merit equitable tolling); Dennis v. Woodford, 65 F. Supp. 2d 1093, 1097 n.5 (N.D. Cal. 1999) (rejecting equitable tolling claim due to "lack of specific, particularized facts which would make equitable tolling appropriate").

The records above reflect that from September 13, 2014, through June 7, 2017, petitioner made one attempt to contact counsel on November 30, 2016.  While counsel apparently failed to respond to this letter, the records reflect that petitioner made no further attempts to obtain his legal files until August 11, 2017, when he sent mail to the Sacramento County Public Defender's Office and apparently received his legal files in response.  Petitioner does not explain why he made no attempts to obtain his legal files from September 13, 2014, until November 30, 2016.[2] Petitioner also does not explain why he waited until August 2017 to request his legal files from the Sacramento Public Defender's Office after receiving no response to his November 30, 2016 letter to counsel.  Accordingly, the undersigned does not find that petitioner's two attempts to obtain his legal files over the approximate three year period demonstrates diligence.

Assuming petitioner acted diligently in his attempts to obtain counsel's files, petitioner did not file his state habeas petition raising claims one and two until approximately eleven months after he received the files.  Petitioner's delay in receiving these files does not explain this eleven month gap.  Therefore, petitioner is not entitled to equitable tolling based on his alleged delay in receiving counsel's files because, for the reasons discussed herein, petitioner offers no adequate explanation for this eleven month gap.  Smith v. Davis, 953 F.3d 598-99 (in order to demonstrate diligence for equitable tolling, petitioner must show that he "has been reasonably diligent in pursuing his rights not only while an impediment to filing caused by an extraordinary circumstance existed, but before and after as well, up to the time of filing his claim in federal

---

[2] While petitioner alleges that he attempted to call counsel, petitioner does not allege when he made these alleged phone calls or otherwise describe these phone calls.  Accordingly, the undesigned finds these allegations vague and conclusory.

1   court.").

2         The undersigned also finds that petitioner did not act diligently in attempting to obtain his

3   sentencing transcript.  The Superior Court denied his request for the sentencing transcript on July

4   18, 2018, although it is unclear when petitioner made the request for the transcript.  However,

5   based on the Superior Court's denial of petitioner's request for the transcript approximately five

6   years after petitioner's conviction, the undersigned finds that petitioner fails to demonstrate that

7   he acted diligently in requesting the sentencing transcript.

8         For the reasons stated herein, the undersigned further finds that the denial of petitioner's

9   request for his sentencing transcript and petitioner's alleged failure to obtain his legal files until

10   September 2017 did not prevent petitioner from raising claim two (alleging incompetence to

11   plead no contest) because petitioner did not require the legal files and/or sentencing transcript to

12   raise this claim.  See Waldron-Ramsey v. Pacholke, 556 F.3d 1008, 1014 (9th Cir. 2009) (no

13   equitable tolling where petitioner did not have state court records; diligent petitioner could have

14   prepared basic form habeas petition and filed it to satisfy AEDPA deadline or at least filed it

15   sooner); Ford v. Pliler, 590 F.3d 782, 790 (9th Cir. 2009) (lack of legal files does not entitle a

16   petitioner to equitable tolling when the petitioner knows the factual bases of his claims).

17         In claim two, petitioner alleges that he was incompetent to plead no contest.  (ECF No. 12

18   at 12-13.)  In support of this claim, petitioner cites his mental health records from the Sacramento

19   County Jail during the relevant time period.  (Id. at 51-95, 97-116.)   Petitioner obtained these

20   records from the Sacramento County Jail in a request dated March 12, 2016.  (Id. at 51.)

21   Petitioner did not require the sentencing transcripts or counsel's file to raise this claim.

22   Accordingly, petitioner is not entitled to equitable tolling as to claim two on these grounds.

23         For the reasons stated herein, the undersigned also finds that the record demonstrates that

24   petitioner did not require the sentencing transcript to raise any of his ineffective assistance of

25   counsel claims and also that petitioner knew the factual bases of at least two of his ineffective

26   assistance of counsel claims prior to his receipt of counsel's files.

27         In claim one, petitioner alleges that counsel was ineffective on the following grounds:

28   1) at the preliminary hearing, held September 7, 2012, counsel falsely told the court that counsel

had advised petitioner of his constitutional rights; 2) counsel was unprepared for the preliminary

hearing; 3) counsel falsely told petitioner that petitioner was facing a 60 years sentence when he

advised petitioner to accept the plea deal of 18 years; 4) counsel advised petitioner to plead guilty

despite the existence of exculpatory/mitigating evidence and the favorable gang expert report;

5) counsel failed to file an appeal, as promised; and 6) counsel failed to request a competency

hearing.  (Id. at 8-11.)

Petitioner did not require the sentencing transcript to raise any of his ineffective assistance

of counsel claims.  Accordingly, petitioner is not entitled to equitable tolling based on the denial

of his request for this transcript on these grounds.

Petitioner did not require counsel's files to raise his claim alleging that counsel was

ineffective for failing to request a competency hearing.  This claim is largely based on the mental

health records petitioner obtained in March 2016.  Accordingly, petitioner is not entitled to

equitable tolling on these grounds.

The undersigned also finds that petitioner did not require counsel's files to raise his claim

alleging that counsel was ineffective for failing to file an appeal.  In his first state habeas petition

filed March 19, 2017, petitioner indicated his awareness that no appeal was filed.  (ECF No. 17-3

at 5.)  Accordingly, petitioner is not entitled to equitable tolling on these grounds.

Petitioner alleges that counsel was ineffective for advising petitioner to plead guilty

because counsel possessed supportive witness statements and supportive gang expert testimony.

(ECF No. 12 at 11.)  Petitioner appears to suggest that he discovered the favorable gang expert

report and witness statements when he obtained counsel's files from the Sacramento Public

Defender's office in September 2017.  However, petitioner also alleges that during the September

7, 2012 preliminary hearing, he told counsel that he was innocent and would like to have the

victims or witnesses cross-examined.  (Id.)  Petitioner also alleges that he repeatedly called and

wrote counsel asking him to make progress on his defense.  (Id. at 9.)  Petitioner alleges that he

begged counsel to have investigators obtain statements from witnesses.  (Id.)

Petitioner may not have been unaware of the specific statements by the gang investigator

and witnesses until he obtained counsel's files in September 2017.  However, at the time

1    petitioner pled guilty, petitioner believed that he was innocent and that favorable witnesses

2    existed.  It does not appear that petitioner required the expert and witness statements later

3    obtained from counsel's file to proceed with his claim alleging that counsel advised him to plead

4    guilty despite his innocence and the existence of exculpatory evidence.  However, the

5    undersigned is reluctant to make this finding without further factual development of the record.

6         Petitioner alleges that counsel falsely told the court that he advised petitioner of his

7    constitutional rights during the preliminary hearing.  Petitioner also alleges that counsel was

8    ineffective for failing to present evidence in his defense at the preliminary hearing.  Attached as

9    an exhibit to the amended petition is a partial transcript from the September 7, 2012 preliminary

10   hearing, which petitioner may have obtained from counsel's files.  At this hearing, counsel

11   stipulated that petitioner had been advised of his constitutional right to a preliminary hearing.  (Id.

12   at 32.)  Petitioner was present at the preliminary hearing and discussed a possible plea bargain

13   with the court.  (Id. at 31, 33.)

14        Because petitioner was present at the preliminary hearing and appeared to understand the

15   proceedings, it does not appear that petitioner required counsel's files to raise his claims alleging

16   counsel's ineffectiveness at the preliminary hearing.  However, the undersigned is reluctant to

17   make this finding without further factual development of the record.

18        Petitioner alleges that counsel was ineffective for advising him to accept the plea bargain

19   of 18 years because petitioner faced a 60-year sentence.  Petitioner alleges that he really faced

20   only 35 years.  (Id. at 9.)  Petitioner alleges that he discovered his "true" prison time exposure

21   when the Superior Court denied his habeas petition in November 2018.  (Id.)  The November 19,

22   2018, Superior Court opinion states that petitioner's exposure was approximately 35 years.  (ECF

23   No. 17-6 at 3.)

24        Petitioner does not appear to have required counsel's files to raise his claim alleging that

25   counsel wrongly advised him that he faced 60 years.  However, the undersigned is reluctant to

26   make this finding without further development of the record.  The undersigned also finds that

27   petitioner is not entitled to equitable tolling based on his discovery, after receiving the November

28   2018 Superior Court opinion, that his true exposure was approximately 35 years.  Petitioner

1  raised his claim regarding counsel's failure to correctly advise him regarding the exposure he

2  faced before receiving the Superior Court opinion.  In other words, petitioner was able to raise

3  this claim despite being unaware of his true exposure.

4          In conclusion, for the reasons discussed above, petitioner is not entitled to equitable

5  tolling based on the denial of his request for the sentencing transcript and the delay in receiving

6  his counsel's files.

7          *Equitable Tolling Based on Mental Health Issues*

8          The undersigned herein considers whether petitioner's mental health issues prevented him

9  from filing a timely federal petition.

10         In Bills v. Clark, 628 F.3d 1092, 1099-100 (9th Cir. 2010), the Ninth Circuit held that

11 proof of a severe mental impairment can qualify for equitable tolling where the petitioner meets a

12 two-part test:

13              (1) *First*, a petitioner must show his mental impairment was an
                "extraordinary circumstance" beyond his control, by demonstrating
14              the impairment was so severe that either

15              (a) petitioner was unable rationally or factually to personally
                understand the need to timely file, or
16

17              (b) petitioner's mental state rendered him unable personally to
                prepare a habeas petition and effectuate its filing.

18              (2) *Second*, the petitioner must show diligence in pursuing the claims
                to the extent he could understand them, but that the mental
19              impairment made it impossible to meet the filing deadline under the
                totality of the circumstances, including reasonably available access
20              to assistance.

21 Id. at 1099-100 (emphasis in original; internal citations omitted).

22         Attached as exhibits to the amended petition are some of petitioner's mental health

23 records from when petitioner was incarcerated at the Sacramento County Jail and following his

24 transfer to the California Department of Corrections and Rehabilitation ("CDCR").  As discussed

25 above, petitioner's conviction became final on May 21, 2013.  Accordingly, the undersigned

26 herein considers whether petitioner's mental health records following May 21, 2013, demonstrate

27 grounds for equitable tolling.

28 ////

                                              14

Petitioner includes his CDCR mental health records and some medical records from the time he entered CDCR, on or around April 25, 2013, to January 30, 2018.  (ECF No. 118-219.)  These records reflect that petitioner had mental health problems.  However, these records do not demonstrate that petitioner's mental health problems rendered petitioner unable to rationally or factually understand the need to timely file a petition or unable to prepare a petition and effectuate its filing.  The undersigned describes a significant number of these records herein.

A May 7, 2013 mental health evaluation states, in part, that petitioner's short term memory, attention and concentration were poor.  (ECF No. 12 at 162.)  However, petitioner's thought process was logical and goal-directed, but at time circumstantial.  (Id.)  The evaluation also states, "Poor reality testing ability.  I/P reports both auditory and visual hallucinations of a persecutory type, which started at approximately age 12."  (Id.)

An interdisciplinary progress note dated May 9, 2013, prepared by CDCR Staff Psychiatrist Deal states, in relevant part, "Flow of thought:  Logical and goal oriented.  Insight/Judgment:  Fair."  (Id. at 124.)  At this time, plaintiff took no psychiatric medication, although he reported taking medication in jail.  (Id. at 124-25.)

An interdisciplinary progress note June 6, 2013, by Clinician Nunez states, in part, that petitioner's thought processes were logical and goal directed, his cognition was within normal limits, his attitude was good, and his memory was within normal limits.  (Id. at 128.)

On July 19, 2013, Dr. Berger prescribed Remeron for petitioner, at petitioner's request.  (Id. at 164.)

A mental health placement chrono dated August 18, 2013, states that petitioner met the inclusion criteria for placement in the Clinical Case Management ("CCMS") level of care.  (Id. at 132.)  The chrono did not state that petitioner should participate in the Enhanced Outpatient Program ("EOP") level of care.  The EOP is a program for inmates suffering from mental illness who require intensive mental health treatment, whereas CCCMS status is assigned to inmates with mental health issues who do not need the intensive treatment provided by EOP.  Ager v. Hedgepath, 2014 WL 1266120, at *2 (N.D. Cal. March 26, 2014).

////

Petitioner provided a request for health services request form dated July 1, 2013, in which he wrote, "I'm seeing things and having a hard time sleeping.  I need to get put back on my medication." (Id. at 139.)  On July 31, 2013, Dr. Yergensen wrote that petitioner described significant childhood trauma and being placed in foster care at age 5 due to physical abuse.  (Id. at 143.)  Petitioner spent most of his childhood in and out of foster care.  (Id.)  Petitioner reported that his mother has a substance abuse problem and petitioner witnessed his step-father being murdered.  (Id.)  Petitioner spent the majority of his adolescence in probation and group homes. (Id.)  Dr. Yergensen wrote that petitioner's symptoms, i.e. visual and auditory hallucinations, were more consistent with PTSD rather than psychosis.[3]  (Id.)  Dr. Yergensen wrote that petitioner would be maintained at CCCMS pending past psychiatric records review.  (Id.)

An interdisciplinary progress note dated October 9, 2013, states that petitioner's thought process was somewhat disorganized.  (Id. at 155.)  Petitioner reported depression related to incarceration and having a cellmate.  (Id.)

Petitioner provided a form titled "Rules Violation Report Mental Health Assessment," dated October 16, 2013.  (ECF No. 12 at 137.)  This document, signed by Clinician Kelsen, states that petitioner had no thought disorder and his insight and judgment were both good.  (Id.)

An interdisciplinary note dated October 23, 2013, by Dr. Elliott states that petitioner was taking Prozac.  (Id. at 144.)

An Interdisciplinary Progress Note dated October 23, 2013, describes petitioner's thought processes as linear.  (Id. at 157.)  The Progress Note also states, "Thought Content:  no abnormal content revealed."  (Id.)

An interdisciplinary progress note dated November 1, 2013, states that petitioner started a low dose of Remeron on July 19, 2013, and was then placed on Prozac.  (Id. at 146.)

Petitioner provided an Interdisciplinary Progress Note dated November 20, 2013, where petitioner reported, "I've been alright.  I'm hanging in there."  (Id. at 147.)  Dr. Peake wrote that petitioner's thought process was organized and goal oriented.  (Id.)  Dr. Peake also wrote,

---

[3]  Dr. Yergensen's diagnosis of petitioner having PTSD, as opposed to psychosis, is not contradicted in any of the later records submitted by petitioner.

"Thought content-no delusions of ideas; insight and judgment are marginal." (<u>Id.</u>)  This progress note states that petitioner had "poor compliance" with Prozac.  (<u>Id.</u>)

A report by Dr. Yergensen dated November 25, 2013, states that petitioner was placed in administrative segregation ("ad seg") after being accused of throwing coffee on another inmate. (<u>Id.</u> at 149.)  While in ad seg, petitioner reported feeling suicidal and was placed in CTC for five days.  (<u>Id.</u>)  Petitioner reported having a nervous breakdown in ad seg that lasted 24 hours.  (<u>Id.</u>) Dr. Yergensen recommended that petitioner remain in CCCMS level of care.  (<u>Id.</u> at 148.)  Dr. Yergensen wrote that petitioner was prescribed Prozac while in the CTC but it was discontinued when he returned to C quad.  (<u>Id.</u>)  Petitioner reported that he stopped taking Prozac because he did not want to take it.  (<u>Id.</u>)

Petitioner provided a Mental Health Placement Chrono dated December 6, 2013, stating that petitioner met the criteria for placement in the CCMCS level of care.  (<u>Id.</u> at 134.)

An interdisciplinary report by Dr. Elliott dated January 30, 2014, states that petitioner was not currently prescribed psychiatric medication.  (<u>Id.</u> at 150.)  Dr. Elliott wrote that petitioner's thought process was linear and no abnormal thought content was revealed regarding petitioner's thought content.  (<u>Id.</u> at 151.)

A report by a psychiatrist dated January 31, 2014, states that petitioner was placed in ad seg for fighting.  (<u>Id.</u> at 153.)  The report states that petitioner's speech was linear, logical and goal oriented.  (<u>Id.</u>)  Petitioner's thought process was organized.  (<u>Id.</u>)  There was "no overt evidence of perceptual or cognitive disturbance."  (<u>Id.</u>)  There was no evidence of acute distress or dysregulated affect or behavior or suicidal/homicidal ideation.  (<u>Id.</u>)

An entry by Dr. Yergensen dated February 13, 2014, states that petitioner has been medication-free since his return to C quad from ad seg.  (<u>Id.</u> at 158.)  Dr. Yergensen wrote that the plan was to continue petitioner in CCCMS until he transferred to a Level IV prison.  (<u>Id.</u>)

A mental health evaluation form dated May 20, 2015, states that petitioner reported mild depression, difficulty sleeping and "env stress."  (<u>Id.</u> at 184.)  Plaintiff's current diagnosis was described as "D/O-DEP MOOD" and "CANNABIS DEP."  (<u>Id.</u>)  The note states that petitioner reported that he was presently stable.  (<u>Id.</u>)  Petitioner continued to demonstrate poor insight and

1  limited judgment." (Id.)  Petitioner was not taking any medication.  (Id.)

2        An interdisciplinary progress note by Dr. Tusel dated October 7, 2015, states that,

3  "According to his CM, patient has been stable for over a year, and goal had been to remove

4  CCCMS if he remains stable.  Initially entered CCCMS due to stress over long sentence." (Id. at

5  195.)  Dr. Tusel described petitioner's thought process as linear and goal-directed.  (Id.)

6        An interdisciplinary progress note by Dr. Crayton dated November 15, 2015, states that he

7  prescribed Zoloft and Vistaril for petitioner.  (Id. at 173.)

8        An interdisciplinary progress note by Dr. Hong dated December 28, 2015, described

9  petitioner's thought process as coherent.  (Id. at 171.)  Petitioner reported that he was doing well

10  since he had gotten on medications for anxiety and sleep.  (Id.)  Petitioner reported that he was

11  working on a lawsuit against CDCR and working with his dad to get a new attorney in order to

12  reduce his sentence.  (Id.)

13        An interdisciplinary report by Dr. Hong dated January 12, 2016, described petitioner's

14  thought process as coherent.  (Id. at 169.)

15        An interdisciplinary progress note by Dr. Hong dated February 2, 2016, states that

16  petitioner was in a good mood because his father informed him that his time in prison can be

17  reduced by a new law or policy.  (Id. at 168.)  Dr. Hong described petitioner as "future focused."

18  (Id.)  Dr. Hong described petitioner's thought progress as coherent.  (Id.)

19        An interdisciplinary progress note by Dr. Hong dated February 9, 2016, states that

20  petitioner appeared to be in a good mood because he may get additional time off of his sentence

21  due to the removal of a gun enhancement.  (Id. at 166.)  Petitioner "expressed a commitment to

22  stay away from crime once he gets out because he adamantly wants to stay out of prison."  (Id.)

23  Dr. Hong described petitioner's thought process as coherent.  (Id.)

24        Petitioner did not provide any mental health records from 2017.  However, petitioner

25  provided a medical record dated May 2, 2017, stating that he had concussions and "headaches

26  here and there…well, chronic, maybe every other day.  Just sometimes you know." (Id. at 199.)

27  Petitioner stated that the headaches did not prevent him from doing things.  (Id.)

28  ////

Petitioner provided a medical record from April 19, 2017, addressing his complaints of head trauma, medication refusal, DM and request for diabetic shoes.  (Id. at 201.)  Petitioner reported that he sustained multiple head injuries and was concerned about concussion.  (Id.)  Petitioner said he had headaches, episodes of dizziness and blurry vision, balance problems, lack of coordination, attention and feeling like fog.  (Id.)  Petitioner was referred to optometry for diabetic eye exam and to rule out retinal hemorrhage.  (Id. at 202.)  Regarding petitioner's history of concussions, the doctor wrote that exam was normal, normal attention and processing.  (Id.)  Petitioner insisted on a CT scan of his head.  (Id.)  The doctor submitted an RFS.  (Id.)  Regarding petitioner's diabetes, the doctor explained to petitioner that medication compliance is essential.  (Id.)

Finally, petitioner includes a form titled "Mental Health IDTT IPage Forms," which appears to be dated January 17, 2018.  (Id. at 217-19.)  In relevant part, this form states that petitioner suffers from a mood disorder and PTSD.  (Id. at 217.)

The records described above demonstrate that petitioner suffers from mental illness.  However, these records do not demonstrate that petitioner's mental illness rendered petitioner unable to rationally or factually understand the need to timely file a petition or unable to prepare a petition and effectuate its filing from the time of his incarceration in CDCR to the time he filed the instant action.  The records set forth above demonstrate that shortly following petitioner's incarceration in CDCR in April 2013, petitioner's doctors generally found petitioner's thought processes to be coherent.

Most importantly, on February 2, 2016, Dr. Hong recorded that petitioner was in a good mood because his father informed him that his prison time could be reduced by a new law or policy.  This entry undermines petitioner's claim that his mental illness prevented him from understanding the need to file a petition challenging his conviction.  Petitioner did not file his state habeas petition raising the claims raised in the instant action until August 30, 2018, i.e., over two years after February 2, 2016.

Petitioner's ability to file his first state habeas petition on March 17, 2017, (challenging the restitution imposed) also undermines petitioner's claim that his mental health problems

1    prevented him from filing a habeas petition raising claims one and two.

2         Moreover, petitioner attaches to his amended petition outgoing mail records from January

3    5, 2018, to March 14, 2018.  (ECF No. 12 at 221.)  These records reflect that petitioner sent mail

4    to the United States District Court for the Northern District of California on January 16, 2018,

5    February 2, 2018, and February 22, 2018.  (Id.)  Records from the Northern District reflect that

6    petitioner filed a civil rights action on March 12, 2018.[4]  Brown v. Flores, 5: 18-cv-1578 LKK

7    (ECF No. 1.)  On May 22, 2018, the court dismissed plaintiff's complaint with leave to amend.

8    Id. (ECF No. 4.)  On June 5, 2018, plaintiff filed an amended complaint.  Id. (ECF No. 10.)  On

9    August 20, 2018, the court dismissed the action with prejudice.  Id. (ECF No. 18.)

10        Records from the Northern District reflect that petitioner filed another civil rights action

11   on May 31, 2017.  Brown v. Aboytes, 3: 17-cv-3120 JCS (ECF No. 1.)  On January 26, 2018,

12   defendants filed a summary judgment motion.  Id. (ECF No. 16.)  On February 26, 2018, plaintiff

13   filed a 78-pages long opposition, including exhibits, to defendants' summary judgment motion.

14   Id. (ECF No. 19.)  On September 24, 2018, the court denied defendants' summary judgment

15   motion.  Id. (ECF No. 34.)

16        Petitioner's ability to litigate the two actions filed in the Northern District in 2017 and

17   2018, before his filed his state habeas petition on August 30, 2018, raising claims one and two,

18   also undermine petitioner's claim that he is entitled to equitable tolling based on mental illness.

19        For the reasons discussed above, petitioner is not entitled to equitable tolling based on

20   mental illness.

21        *Inadequate Law Library Access*

22        Petitioner alleges that inadequate law library access prevented him from filing a timely

23   federal petition.

24        Ordinary prison limitations on a petitioner's access to the law library do not constitute

25   extraordinary circumstances for equitable tolling or make it impossible to file a petition in a

26   timely manner.  See Ramirez v. Yates, 571 F.3d 993, 998 (9th Cir. 2009) (observing that

27

28   _____

[4] The undersigned takes judicial notice of the records from the Northern District.  See Mullis v. U.S. Bank. Ct., 828 F.2d 1385, 1388 n.9 (9th Cir. 1987).

1    concluding otherwise would "permit the exception to swallow the rule" that equitable tolling is

2    permissible only where a petitioner shows that "extraordinary circumstances" stood in the way of

3    timely filing a petition); see also Poulain v. Gulick, 700 Fed. App'x 736, 737 (9th Cir. 2017)

4    (reaffirming same).  Nevertheless, the undersigned considers petitioner's evidence regarding

5    inadequate law library access herein.

6         Petitioner provides records from several administrative grievances and request for

7    interview forms alleging inadequate law library access.  In grievance SVSP-L-15-04206, signed

8    September 14, 2015, petitioner alleged that he mailed four inmate requests for law library access

9    but received no response.  (ECF No. 12 at 261-62.)  The first level response included petitioner's

10   alleged library access history from January 30, 2015, to October 9, 2015.  (Id. at 252.)  The

11   undersigned sets forth the history described in the response:  1) September 30, 2015, access

12   request received; 2) September 24, 2015, accessed library; 3) August 2, 2015, access request

13   received; 4) July 29, 2015, accessed library; 5) June 18, 2015, access request received; 6) June 12,

14   2015, accessed library; 7) May 5, 2015, accessed library—removed due to disruptive behavior; 8)

15   May 5, 2015, access request received; 9) April 8, 2015, accessed library; 10) April 8, 2015,

16   access request received; 11) March 12, 2015, accessed library; 12) March 12, 2015, access

17   request received; 13) March 9, 2015, accessed library; 14) March 9, 2015, access request

18   received; 15) February 26, 2015, accessed library; 16) February 25, 2015, access request

19   received; 17) February 12, 2015, access request received; 18) February 3, 2015, access request

20   received; 19) January 27, 2015, access request received; 20) January 27, 2015, access request

21   received; 21) January 26, 2015, access request received; 22) January 16, 2015, accessed library;

22   23) January 16, 2015, access request received; and 24) January 13, 2015, access request received.

23   (Id. at 252.)

24        The response to petitioner's grievance states that library records corroborate petitioner's

25   claim that there was a gap between his access on July 29, 2015, and September 24, 2015.  (Id. at

26   253.)  This gap was "largely prompted by a modified program on C yard because of a riot on or

27   around  8/27/2015 that was not lifted until on or around September 29, 2015."  (Id.)  It was

28   determined by prison staff that C yard program, including library, might be impacted to ensure

the safety and security of the institution.  (Id.)

In grievance SVSP-16-3170, signed on May 25, 2016, petitioner alleged that he had been on B yard since March 15, 2016.  (Id. at 263.)  Petitioner alleged that on April 1, 2016, he submitted a law library request but did not receive law library access.  (Id.)  This grievance was rejected at the First Level of Review by the Senior Librarian, although it is unclear why.  (Id. at 264.)

In grievance SVSP-16-4570, signed on March 2, 2016, petitioner alleged he was on A yard and only allowed law library once.  (Id. at 265.)  Petitioner requested two hours of law library access per week.  (Id.)  Petitioner did not include the response by prison officials to this grievance.

Petitioner signed grievance PBSP-B-18-1478 on May 7, 2018.  (Id. at 287.)  In this grievance, petitioner alleged that he had a "criminal habeas corpus and a civil suit I'm currently in process of concluding."  (Id.)  Petitioner requested law library access.  (Id.)  Prison officials submitted the first level response to grievance PBSP-B-18-01478 dated June 28, 2108.  (Id. at 267-68.)  The response states that petitioner had law library access on the following dates:  June 21, 2018, June 18, 2018, June 15, 2018, June 13, 2018, June 11, 2018, June 7, 2018, June 5, 2018, May 31, 2018, May 30, 2018, and May 23, 2018.  (Id.)  The response states that petitioner had Preferred Legal User ("PLU") on June 5, 2018, June 7, 2018, June 11, 2018, June 13, 2018, June 15, 2018, and June 18, 2018.  (Id.)

Petitioner also submitted several inmate request for interview forms regarding law library access.  (Id. at 271-86.)  These requests are dated September 9, 2015, November 8, 2015, May 3, 2016, July 5, 2016, July 12, 2016, August 2, 2016, June 26, 2016.  (Id.)  Petitioner also included a law library request form stamped March 15, 2018.  (Id. at 290.)  Petitioner requested PLU status for a case pending in the United States District Court for the Northern District of California, 17-cv-1320.  (Id.)  Petitioner also included a request for interview form seeking information regarding his PLU request for law library access regarding his case filed in the Northern District.  (Id. at 291.)

Petitioner included a request for interview form signed June 26, 2018, in which he wrote

1  that he had put in multiple law library access requests since June 19, 2018.  (Id. at 297.)

2  Petitioner's request is difficult to read, but it appears that he wrote that he has not been allowed

3  the "opportunity" since June 18, 2018, i.e., he had not had law library access since June 18, 2018.

4  (Id.)

5        Petitioner also included a first level response to grievance HDSP-D-18-4180 in which he

6  alleged that on October 29, 2018, he received a fabricated General Chrono from the Law

7  Librarian.  (Id. at 298-99.)

8        The records above do not demonstrate that petitioner's law library access was so limited

9  that he would have been unable to prepare a timely state or federal petition raising claims one and

10  two.  The undesigned also makes the following observations regarding petitioner's law library

11  access, as reflected in the records described above, following his alleged receipt of counsel's files

12  in September 2017.

13        The only records submitted by petitioner addressing his law library access following

14  September 2017 and before he filed the state habeas petition raising claims one and two on

15  August 30, 2018, are grievance PBSP-B-18-1478 and petitioner's June 26, 2018 request for

16  interview form.

17        As discussed above, the response to grievance PBSP-B-18-1478 states that petitioner had

18  law library access on June 21, 2018, June 18, 2018, June 15, 2018, June 13, 2018, June 11, 2018,

19  June 7, 2018, June 5, 2018, May 31, 2018, May 30, 2018, and May 23, 2018.  Petitioner's June

20  26, 2018 request for interview form appears to state that petitioner last had law library access on

21  June 19, 2018.  These records do not demonstrate that inadequate law library access prevented

22  petitioner from filing a habeas petition in state court until eleven months after receiving counsel's

23  legal files from the Sacramento Public Defender's Office.

24        The undersigned also finds that petitioner's ability to litigate two civil rights actions in the

25  Northern District *after* receiving his files from the Sacramento Public Defender's Office in

26  September 2017 undermines petitioner's claim that inadequate law library access prevented him

27  from filing a timely federal (or state) petition.

28        Accordingly, for the reasons discussed above, the undersigned finds that petitioner is not

1    entitled to equitable tolling based on inadequate law library access.

2         *Actual Innocence*

3         The undersigned also finds that petitioner has not established that he is entitled to pass

4    through the actual innocence gateway to obtain relief from the expiration of the statute of

5    limitations as to claims one and two.

6         "[W]here an otherwise time-barred habeas petitioner demonstrates that it is more likely

7    than not that no reasonable juror would have found him guilty beyond a reasonable doubt, the

8    petitioner may pass through the Schlup [v. Delo, 513 U.S. 298 (1995),] gateway and have his

9    constitutional claims heard on the merits." Lee v. Lampert, 653 F.3d 929, 937 (9th Cir. 2011) (en

10   banc); McQuiggin v. Perkins, 569 U.S. 383, 386 (2012). The Supreme Court held in Schlup, that

11   a habeas petitioner who makes a "colorable claim of factual innocence" that would implicate a

12   "fundamental miscarriage of justice" may be entitled to have "otherwise barred constitutional

13   claim[s] considered on the merits." Schlup, 513 U.S. at 314-15.

14        To invoke the miscarriage of justice exception to AEDPA's statute of limitations, a

15   petitioner must show that it is more likely than not that no reasonable juror would have convicted

16   him in light of the new evidence. McQuiggin, 569 U.S. at 386. This exception is concerned with

17   actual, as opposed to legal, innocence and must be based on reliable evidence not presented at

18   trial. Schlup, 513 U.S. at 324; Calderon v. Thompson, 523 U.S. 538, 559 (1998). To make a

19   credible claim of actual innocence, petitioner must produce "new reliable evidence—whether it

20   be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical

21   evidence—that was not presented at trial." Schlup, 513 U.S. at 324.

22        Petitioner's actual innocence claim appears to be based on documents attached to the

23   amended petition as exhibit B, including an expert witness report and witness statements.

24   However, to put these exhibits in context, the undersigned discusses documents attached to

25   petitioner's exhibit A.

26        Exhibit A includes a report (of unknown origin) describing petitioner' offense:

27        The following information was summarized from Sacramento Police
     Department Report #12-89192 at the Sacramento Sheriff's
28   Department Report #12-129600.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

On 4/2/12, the male and female victims (Charlester O. and Quanettia M.) were at the Bon Faire Market located at 3100 Broadway, when they observed the defendant whom they have known for several years. The defendant, a validated Fourth Avenue Blood criminal street gang member, approached the victims, demanded money, and exposed a gun in his front pants pocket. The defendant has prior felony convictions that prevent him from owning or possessing firearms. The defendant threatened to shoot the victims if they did not give him money. Charlester O. handed the defendant $2.00 in cash and Quanettia M. did not give him anything. The defendant reached into the victims' vehicle and tried to take a purse. Quanettia M. prevented the defendant from taking her purse, but he grabbed her I-pod and walked away. The defendant entered a nearby vehicle and fled the scene.

On 4/6/12, the defendant was arrested and booked into the Sacramento County Main Jail. On 4/10/12, he was released from custody after no charges were filed.

On 4/13/12, a warrant was issued for the defendant. On 4/22/12, he was arrested and booked into the Sacramento County Main Jail.

On 7/31/22, at 1100 hours, a deputy assigned to the main jail as a gang intelligence officer intercepted an outgoing letter from the defendant, which contained wording that led the deputy to believe the defendant was attempting to intimidate a witness. A telephone number provided in the letter was subsequently dialed by a deputy and answered by Charlester O., one of the robbery victims.

****

On 2/28/13, the defendant was interviewed, via video-conference, at the Rio Consumnes Correctional Center. He denied robbing the victims, but admitted arguing with them because they verbally disrespected him two weeks prior. The defendant reported entering into the plea agreement because he did not want to go to trial and risk receiving a longer prison sentence.

(ECF No. 12 at 34.)

Attached to petitioner's exhibit B is a report by James Hernandez, D.P.A. addressing whether petitioner's offense was gang related. (Id. at 36-38.) Mr. Hernandez concluded that the incident was not gang-related. (Id. at 38.) However, because petitioner did not admit gang-related charges, the undersigned finds that Mr. Hernandez's report is not relevant to petitioner's actual innocence claim.

Exhibit B also includes 4 witness statements. (ECF No. 39-49.) Petitioner apparently obtained these witness statements from the legal files he received from the Sacramento Public

25

Defender's Office in September 2017.  Arguably, these witness statements are not new evidence because it appears likely that petitioner identified these witnesses to his counsel.  However, assuming these witness statements are new evidence, for the reasons stated herein, the undersigned does not find that it is more likely than not that no reasonable juror would have convicted petitioner based on this evidence.

The first witness statement is from Carl Crump.  Mr. Crump states that he has known Charlester O., aka June, for a few years.  (Id. at 40.)  Mr. Crump states that he talked to petitioner on the phone and that petitioner, "just talked about wanting to talk to June and apologize for what happened to say everything was okay."  (Id.)  Mr. Crump states that he had not talked to Charlester O. because he did not want to get involved.  (Id.)  The undersigned finds that Mr. Crump's statement contains no evidence supporting petitioner's claim of actual innocence.

The second witness statement is from Marcell Maurice Williams.  He is petitioner's brother.  (Id. at 42.)  Mr. Williams states,

> I was with Mark when the incident happened at the Bonfare.  We were in my car and I parked right up in front of the store.  I got out and went inside.  When I came outside, it was over.  The only thing I saw was Mark yelling at a female.  He was telling her to get away because she kept coming up on him.  Mark got into another car with a light skinned guy.  I don't know who it was.

> I have spoken to June since the incident happened in April.  Mark never asked me to talk to June or anybody.  I just did it on my own.  I just talked to him like I'm talking to you.  I never made any threats to him.

> I got June's dad's number first and talked to him.  I don't know how I got the number.  I don't know his dad's name.  I left a message on his phone and he called me back.  I talked to him about a month to a month and a half before I ran into June.  When I talked to June's dad, he said his son was not trying to be involved and it was all Netta.  He told me he talked to his son (Charlester) and told him not to be involved.

> I spoke to June on the phone, too.  I had his phone number and left a lot of messages.  I don't remember how I got his number.  Maybe I got it from my uncle.  I think I called June before I ran into him at the liquor store.  When I talked to him, he said he was okay with everything.

> I think it was in May (2012) that I went to the liquor store at Martin Luther King Jr. Boulevard and 9th Avenue.  It's called Stanford Market.  I was pulling up in my car and June was walking away

26

towards 8th Avenue. I got out and talked to him. It was just like I'm talking to you. I told him I had been in the pen and I didn't know what was going on with him and Mark, but my sisters told me about their history with each other. I told him I was Mark's older brother and I would tell Mark to leave it alone and he would listen to me. I told June it shouldn't have gone that far and to leave it alone. June said everything was okay. He said, "It's not me. It's that bitch, Netta!" He told me he didn't fuck with her anymore. We talked for about two minutes and there were no more threats.

I am willing to testify in court.

(Id. at 42-43.)

In his statement, Mr. Williams states that when he came out of the store, "it was over." In other words, Mr. Williams did not witness the incident between petitioner and the victims. In addition, Mr. Williams' statement contains no other information demonstrating petitioner's innocence of the offenses petitioner admitted. Accordingly, the undersigned does not find that it is more likely than not that no reasonable juror would have convicted petitioner based on Mr. Williams' statement.

The third witness statement is from Akintunde Wallace. Mr. Wallace made a statement in response to questions asked of him regarding petitioner and victim Quanettia Mack. (Id. at 44.) Mr. Wallace states that Quanettia Mack is his ex and he thinks she is lying. (Id. at 45.) Mr. Wallace states that every time he has seen her since April 2012, she had an iPod with her. (Id.) Mr. Wallace states that she called him a couple of times and said she wants to see petitioner in prison. (Id.) She did not say anything about finding the iPod she says petitioner stole from her. (Id.)

While Quanettia's possession of an iPod after the robbery may undermine her claim that petitioner stole her iPod, the undersigned does not find that it is more likely than not that no reasonable juror would have convicted petitioner based on Mr. Wallace's statement that he saw Quanettia with an iPod after the robbery.

The fourth witness statement is from Julius Johnson. The statement states that Mr. Johnson made a statement in response to questions regarding any contact he may have witnessed between the victims approximately one week prior to the April 2, 2012 incident. (Id. at 46.) Mr. Johnson then describes an incident that occurred at a house after a funeral for someone named

"Cornbread."  (Id. at 47.)  The house is somewhere around 8th Avenue near Santa Cruz and or San Jose.  (Id.)  June walked up to petitioner and they shook hands and hugged.  (Id.)  They were saying that they should let bygones be bygones.  (Id.)  After ten or fifteen minutes, Quanettia came up and started screaming, "Really, June?  Are you serious?  Are you shaking this nigga's hand?"  (Id.)  Quanettia became aggressive toward petitioner.  (Id.)  Petitioner was calm.  (Id.)  The whole thing lasted about four minutes.  (Id.)  Petitioner did not have a gun.  (Id.)  Mr. Johnson says that Quanettia is saying that petitioner took her IPod, but she had that IPod in her ear every time Mr. Johnson saw her after petitioner was arrested.  (Id.)

The only information in Mr. Johnson's statement directly bearing on petitioner's innocence is his statement that he saw Quanettia with an iPod after the robbery.  While Quanettia's possession of an iPod after the robbery may undermine her claim that petitioner stole her iPod, the undersigned does not find that it is more likely than not that no reasonable juror would have convicted petitioner based on Mr. Johnson's statement that he saw Quanettia with an iPod after the robbery.

Considering the other statements in Mr. Johnson's declaration, including those addressing Quanettia's alleged behavior toward petitioner at the funeral and that petitioner did not have a gun at the funeral, the undersigned does not find that it is more likely than not that no reasonable juror would have convicted petitioner based on these statements.

As discussed above, the four witness statements above are not sufficient to pass petitioner through the Schlup v. Delo gateway and have his constitutional claims heard on the merits. Petitioner's delay in raising his claims suggesting his actual innocence, as discussed above, also support this finding.  The undersigned also finds that petitioner's no-contest plea tends to refute his actual innocence claim.  See Brown v. Miller, 2015 WL 269057, at *7 (C.D. Cal. Jan. 15, 2015) (the Schlup actual-innocence standard "does not readily lend itself to" petitioners who plead guilty); Smith v. Baldwin, 510 F.3d 1127, 1139-40, 1140 n.9, 1141 (9th Cir. 2007) (en banc) (noting "potential incongruity" between "purpose" of Schlup's actual-innocence gateway and "its application to cases involving guilty (or no contest) pleas"; nevertheless applying Schlup standard to petitioner who pleaded no contest to felony murder and concluding that he had not

1   met it).

2          For the reasons discussed above, the undersigned finds that petitioner does not meet the

3   actual innocence exception to the statute of limitations.

4          C.   Claim Three

5          Claim three raises two claims regarding changes in California law allegedly impacting

6   petitioner's sentence.  First, petitioner claims he was wrongly charged with firearm enhancements

7   pursuant to California Penal Code sections 12022.53 and 186.22, in violation of People v. Le, 61

8   Cal.4th 416 (2015).[5]  Second, petitioner alleges that he is entitled to resentencing pursuant to a

9   law passed on January 1, 2018, that gave judges the authority to dismiss or strike enhancements.

10  (Id. at 14-15).  Petitioner identifies this law as California Senate Bill 620.  (Id.)

11          *Claim Based on* *People v. Le*

12          For the reasons stated herein, the undersigned finds that petitioner's claim based on

13  People v. Le is barred by the statute of limitations.

14          For the following reasons, the statute of limitations for petitioner's claim based on People

15  v. Le ran from the date petitioner's conviction became final, pursuant to 28 U.S.C.

16  § 2244(d)(1)(A).

17          Petitioner does not claim that he was impeded from raising his claim based on People v.

18  Le by unconstitutional state action, and thereby entitled to a trigger date under § 2244(d)(1)(B).

19  Further, section (d)(1)(C) only applies to newly recognized rights by the United States Supreme

20  Court.  See Guerrero v. Rackley, 2018 WL 1305635, at *3 (C.D. Cal. Feb. 12, 2018) ("provision

21  applies to constitutional rights newly recognized by United States Supreme Court.").  The law

22  announced in People v. Le is a matter of state law, and as such, does not create a new rule of

23

---

24  [5] In People v. Le, 61 Cal.4th 416 (2015), the California Supreme Court affirmed
    People v. Le, 205 Cal.App.4th 739 (2012).  In Le, the defendant was found guilty

25  of assault with the use of a semi-automatic firearm, in violation of California Penal
    Code § 245(b).  61 Cal.4th at 419. The defendant was also found guilty of sentencing

26  enhancements pursuant to California Penal Code sections 12022.5(a)(1) and
    186.22(b)(1)(B).   Id.   The trial court determined that imposition of both

27  enhancements violated California Penal Code § 1170.1(f) based on the holding of
    People v. Rodriguez, 47 Cal.4th 501 (2009), because both enhancements involved

28  the use of a firearm.  Id. at 421–22.  On review, the California Supreme Court
    affirmed the trial court's sentencing decision.  Id. at 429.

1  constitutional law that can support a later start date under Section 2244(d)(1)(C).  Finally, under

2  Section 2244(d)(1)(D), the statute of limitations runs from the "date on which the factual

3  predicate of the claim or claims presented could have been discovered through the exercise of due

4  diligence."  However, "the factual predicate" in Section 2244(d)(1)(D) does not encompass mere

5  changes in law.  Shannon v. Newland, 410 F.3d 1083, 1088-89 (9th Cir. 2005).

6      Accordingly, the statute of limitations for petitioner's claim based in People v. Le runs

7  from the date petitioner's conviction became final.  Therefore, this claim is not timely, for the

8  same reasons as claims one and two, unless petitioner is entitled to statutory or equitable tolling.

9      Petitioner is not entitled to statutory tolling for his claim based on People v. Le because he

10  failed to file any state petitions within the limitations period.  See Ferguson v. Palmateer, 321

11  F.3d at 823; Jiminez, 276 F.3d at 482.

12      The undersigned also finds that petitioner is not entitled to equitable tolling with respect to

13  his claim based on People v. Le on the grounds discussed above, i.e., counsel's failure to file an

14  appeal, mental health problems, inadequate law library access and delay in receiving counsel's

15  files.

16      The undersigned is also not aware of any authority recognizing that the discovery of

17  recent case law constitutes an extraordinary circumstance for purposes of equitable tolling.

18  Magana v. California, 2019 WL 1714549, at *4 (C.D. Cal. Feb. 22, 2019) (citing Tinsley v.

19  Valenzuela, 2014 WL 11858178, at *6 (C.D. Cal. May 7, 2014) (concluding that magistrate judge

20  correctly rejected petitioner's contention that he was entitled to equitable tolling based on the fact

21  that he was only recently able to discover case law supporting his claims because petitioner did

22  not identify, and the court was unable to locate, any case law holding that new case law may

23  constitute an extraordinary circumstance for purposes of equitable tolling); Perez v. Donovan,

24  2016 WL 7974656, at *4 (C.D. Cal. Dec. 12, 2016) (citing Shannon v. Newland, 410 F.3d 1083

25  (9th Cir. 2005)) (rejecting argument for equitable tolling based People v. Le, 61 Cal.4th 416

26  (2015) as new case law).

27      Because equitable tolling is unavailable, petitioner's claims based on People v.Le is

28  barred by the statute of limitations.  Accordingly, respondent's motion to dismiss this claim

1   should be granted.

2           *Claim Based on Senate Bill 620*

3           Rather than considering whether petitioner's claim based on Senate Bill 620 is barred by

4   the statute of limitations, the undersigned recommends that this claim be dismissed for failing to

5   state a cognizable claim for relief.

6           Petitioner's claim for relief based on Senate Bill 620 does not state a cognizable claim for

7   two reasons.  First, Senate Bill 620 does not apply retroactively to defendants, like petitioner,

8   whose sentences were final at the time it became effective.  Pokras v. Superior Court of Los

9   Angeles, 2021 WL 2042463, at *4 (C.D. Cal. May 20, 2021).  Second, petitioner's claim based

10  on Senate Bill 620 challenges only a matter of state sentencing law, which does not state a

11  cognizable on federal habeas review.  Id.  On these grounds, petitioner's claim based on Senate

12  Bill 620 should be dismissed.

13          VI.     Petitioner's Motion to Stay (ECF No. 13)

14          Petitioner requests that this action be stayed so that he may return to state court and

15  exhaust new claims alleging that the accusatory pleading did not constitute a public offense and

16  that he is entitled to a retroactive competency hearing.  (ECF No. 13 at 4.)  Because the

17  undersigned recommends that respondent's motion to dismiss be granted, there is no action to

18  stay.  Accordingly, petitioner's motion to stay should be denied.

19          Accordingly, IT IS HEREBY ORDERED that:

20          1.   Petitioner's motion to amend (ECF No. 11) is granted;

21          2.   Petitioner's motion for an extension of time (ECF No. 53) is disregarded; and

22          IT IS HEREBY RECOMMENDED that:

23          1.   Petitioner's motion to stay (ECF No. 13) be denied; and

24          2.   Respondent's motion to dismiss (ECF No. 16) be granted except for petitioner's claim

25              based on Senate Bill 620;

26          3.   Petitioner's claim based Senate Bill 620 be dismissed for failing to state a cognizable

27              claim for relief.

28          These findings and recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days
after being served with these findings and recommendations, any party may file written
objections with the court and serve a copy on all parties.  Such a document should be captioned
"Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,
he shall also address whether a certificate of appealability should issue and, if so, why and as to
which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the
applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.
§ 2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after
service of the objections.  The parties are advised that failure to file objections within the
specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951
F.2d 1153 (9th Cir. 1991).

Dated:  May 12, 2022

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Br1746.157(2)

32